Michael R. Lozeau (State Bar No. 142893)
Rebecca L. Davis (State Bar No. 271662)
LOZEAU DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Tel: (510) 836-4200
Fax: (510) 836-4205
E-mail: michael@lozeaudrury.com
          rebecca@lozeaudrury.com

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>             Plaintiff,<br><br>      vs.<br><br>KEEFE KAPLAN MARITIME, INC., a corporation,<br><br>             Defendant. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA"), by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further

COMPLAINT

1  necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and

2  33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

3      2.     On June 8, 2018, CSPA provided notice of Defendant's violations of the Act, and of

4  Plaintiff's intention to file suit against Defendant, to the Administrator of the United States

5  Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive

6  Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the

7  California Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board");

8  and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of

9  CSPA's notice letter is attached as Exhibit A, and is incorporated by reference.

10     3.     More than sixty days have passed since notice was served on Defendant and the State

11  and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA

12  nor the State of California has commenced or is diligently prosecuting a court action to redress the

13  violations alleged in this complaint.  This action's claim for civil penalties is not barred by any prior

14  administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

15     4.     Venue is proper in the Northern District of California pursuant to Section 505(c)(1)

16  of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial

17  district.  Pursuant to Local Rule 3-2(d), intradistrict venue is proper in Oakland, California, because

18  the source of the violations is located within Contra Costa County.

19

20  **II.    <u>INTRODUCTION</u>**

21     5.     This complaint seeks relief for Defendant's discharges of polluted storm water from

22  Defendant's industrial facility located at 530 W. Cutting Boulevard in Richmond, California

23  ("Facility") in violation of the Act and National Pollutant Discharge Elimination System ("NPDES")

24  Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-

25  DWQ ("1997 Permit"), as renewed by Water Quality Order No. 2014-0057-DWQ ("2015 Permit")

26  (the permits are collectively referred to hereinafter as the "Permit" or "General Permit").

27  Defendant's violations of the discharge, treatment technology, monitoring requirements, and other

28  procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

COMPLAINT

6. With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, such as those conducted by Defendant, pour into storm drains, local waterways, and the San Francisco Bay. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year.

7. Industrial facilities, like Defendant's, that are discharging polluted storm water and non-storm water contribute to the impairment of downstream waters and aquatic-dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

## III. **PARTIES**

8. Plaintiff California Sportfishing Protection Alliance ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Stockton, California. CSPA has approximately 2,000 members who live, recreate and work in and around waters of the State of California, including the San Francisco Bay. CSPA is dedicated to the preservation, protection, and defense of the environment, the wildlife and the natural resources of all waters of California. To further these goals, CSPA actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

9. Members of CSPA reside in and around the San Francisco Bay and enjoy using the San Francisco Bay for recreation and other activities. Members of CSPA use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged. Members of CSPA use those areas to fish, sail, boat, kayak, swim, bird watch, view wildlife and engage in scientific study including monitoring activities, among other things. Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

10. Continuing commission of the acts and omissions alleged above will irreparably harm

COMPLAINT

3

Plaintiff and its members, for which harm they have no plain, speedy or adequate remedy at law.

11.     Defendant Keefe Kaplan Maritime, Inc. ("KKMI") is a corporation.  Plaintiff is informed and believes and thereupon alleges that KKMI owns and operates the Facility that is the subject of this complaint.

**IV.     STATUTORY BACKGROUND**

12.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

13.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

14.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

**General Permit**

15.     The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board originally issued the General Permit on or about November 19, 1991. The State Board modified the General Permit on or about September 17, 1992.  Pertinent to this action, the State Board reissued the General Permit on or about April 17, 1997 (the "1997 Permit"), and again on or about April 1, 2014 (the "2015 Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).  The 1997 Permit was in effect between 1997 and June 30, 2015. The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

COMPLAINT

4

16.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

17.     The General Permit contains several prohibitions.  Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

18.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

19.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The General Permit requires that an initial SWPPP has been developed and implemented before October 1, 1992.  The objective of the SWPPP requirement is to

identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. *See* 1997 Permit, § A(2); 2015 Permit, § X(C).  These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.  To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary.  1997 Permit, §§ A(9), (10); 2015 Permit, § X(B).  Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit.  2015 Permit, Fact Sheet § I(1).

20.     Sections A(3)-A(10) of the 1997 Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges, including structural BMPs where non-structural BMPs are not effective. Sections X(D) – X(I) of the 2015 Permit set forth essentially the same SWPPP requirements as the 1997 Permit, except that all dischargers are now required to develop and implement a set of minimum BMPs, as well as any advanced BMPs as necessary to achieve BAT/BCT, which serve as the basis for compliance with the 2015 Permit's technology-based effluent limitations and receiving water limitations.  See 2015 Permit, § X(H).  The 2015 Permit further requires a more comprehensive assessment of potential pollutant sources than the 1997 Permit; more specific BMP descriptions; and an additional BMP summary table identifying each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants, and the BMPs being implemented.  See 2015 Permit, §§ X(G)(2), (4), (5).

21.     The 2015 Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial

storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping.  *See* 2015 Permit, § X(H)(1).  Failure to implement all of these minimum BMPs is a violation of the 2015 Permit.  See 2015 Permit, Fact Sheet § I(2)(o).  The 2015 Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  See 2015 Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the 2015 Permit.  *Id.* The 2015 Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  *See* 2015 Permit, § X(H)(4), (5).

22.    The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program.  The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.  As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  The 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the wet season, and at least one other storm event during the wet season, from all storm water discharge locations at a facility.  *See* 1997 Permit, § B(5).  The 2015 Permit now mandates that facility operators sample *four* (rather than two) storm water discharges from all discharge locations over the course of the reporting year.  *See* 2015 Permit, §§ XI(B)(2), (3).

23.    Facilities are required to make monthly visual observations of storm water discharges.  The visual observations must represent the quality and quantity of the facility's storm

water discharges from the storm event.  1997 Permit, § B(7); 2015 Permit, § XI.A.

24.     Section XI(B)(2) of the 2015 Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30).

25.     Under the 1997 Permit, facilities must analyze storm water samples for "toxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."  1997 Permit, § B(5)(c)(ii).  Under the 2015 Permit, facilities must analyze storm water samples for "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment."  2015 Permit, § XI(B)(6)(c).

26.     Section B(14) of the 1997 Permit requires dischargers to include laboratory reports with their Annual Reports submitted to the Regional Board.  This requirement is continued with the 2015 Permit.  Fact Sheet, Paragraph O.

27.     The 1997 Permit, in relevant part, requires that the Annual Report include an Annual Comprehensive Site Compliance Evaluation Report ("ACSCE Report").  1997 Permit, § B(14).  As part of the ACSCE Report, the facility operator must review and evaluate all of the BMPs to determine whether they are adequate or whether SWPPP revisions are needed.  The Annual Report must be signed and certified by a duly authorized representative, under penalty of law that the information submitted is true, accurate, and complete to the best of his or her knowledge.  The 2015 Permit now requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results.  *See* 2015 Permit, § XV.

28.     The General Permit does not provide for any mixing zones by dischargers.  The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

COMPLAINT

**Basin Plan**

29.     The Regional Board has identified beneficial uses of Richmond Inner Harbor and San Francisco Bay region's waters and established water quality standards for San Francisco Bay in the "Water Quality Control Plan for the San Francisco Bay Basin," generally referred to as the "Basin Plan."

30.     The beneficial uses of these waters include water contact recreation, noncontact water recreation, wildlife habitat, preservation of rare and endangered species, commercial and sportfishing, estuarine habitat, fish migration, cold freshwater habitat, and warm freshwater habitat. The noncontact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible.  These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tide pool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities.  Water quality considerations relevant to non-contact water recreation, such as hiking, camping, or boating, and those activities related to tide pool or other nature studies require protection of habitats and aesthetic features."

31.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal or that produce other detrimental responses in aquatic organisms."

32.     The Basin Plan provides that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use."

33.     The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses."

34.     The Basin Plan provides that "[t]he suspended sediment load and suspended sediment discharge rate of surface waters shall not be altered in such a manner as to cause nuisance or adversely affect beneficial uses."

35.     The Basin Plan provides that "[w]aters shall not contain floating material, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial

COMPLAINT

uses."

36.     The Basin Plan provides that the "pH shall not be depressed below 6.5 nor raised above 8.5."

37.     The Basin Plan provides that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses."

38.     The Basin Plan establishes a Marine Water Quality Objective ("WQO") for zinc of 0.081 mg/L (4-day average ["4-DA"]) and 0.09 mg/L (1-hour average ["1-HA").

39.     The Basin Plan establishes a Marine Water Quality Objective for copper of 0.0031 mg/L (4-DA) and 0.0048 mg/L (1-HA).

40.     The EPA has adopted a saltwater numeric water quality standards for zinc of 0.09 mg/L (Criteria Maximum Concentration – "CMC"), and for copper of 0.0048 mg/L (CMC).  65 Fed.Reg. 31712 (May 18, 2000) ("California Toxics Rule").

41.     EPA has established Parameter Benchmark Values as objective guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges from Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (July 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

42.     EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.  The following EPA benchmarks have been established for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("s.u."); total suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L; aluminum – 0.75 mg/L; iron – 1.0 mg/L; zinc – 0.26 mg/L; lead – 0.262 mg/L; chemical oxygen demand ("COD") – 120 mg/L; and biochemical oxygen

1   demand ("BOD") – 30 mg/L.

2   43.     The Numeric Action Levels ("NALs") in the 2015 Permit are derived from these

3   benchmarks.  The 2015 Permit incorporates annual NALs, which are derived from the 2008 MSGP

4   benchmark values, and instantaneous maximum NALs, which are derived from a Water Board

5   dataset.  The following annual NALs have been established under the 2015 Permit: TSS – 100 mg/L;

6   O&G – 15 mg/L; aluminum – 0.75 mg/L; iron – 1.0 mg/L; zinc – 0.26 mg/L; lead – 0.262 mg/L;

7   copper – 0.0332 mg/L; COD – 120 mg/L; and BOD – 30 mg/L.  An exceedance of an annual NAL

8   occurs when the average of all samples obtained for an entire facility during a single reporting year

9   is greater than a particular annual NAL.  The reporting year runs from July 1 to June 30.  The 2015

10  Permit also establishes the following instantaneous maximum NALs: pH – 6.0-9.0 s.u.; TSS – 400

11  mg/L; and O&G – 25 mg/L.  An instantaneous maximum NAL exceedance occurs when two or

12  more analytical results from samples taken for any single parameter within a reporting year exceed

13  the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous

14  maximum NAL range for pH.  When a discharger exceeds an applicable NAL, it is elevated to

15  "Level 1 Status," which requires a revision of the SWPPP and additional BMPs.  If a discharger

16  exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  For Level

17  2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either

18  additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-

19  industrial pollutant sources, or a determination that the exceedance is solely due to the presence of

20  the pollutant in the natural background.

21  44.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement

22  actions against any "person," including individuals, corporations, or partnerships, for violations of

23  NPDES permit requirements.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive

24  relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an

25  assessment of civil penalties of up to $51,570 for violations occurring after November 2, 2015; and

26  up to $37,500 per day per violation occurring since October 28, 2011 up to and including November

27  2, 2015, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40

28

COMPLAINT

C.F.R. §§ 19.1 - 19.4.

V.     **STATEMENT OF FACTS**

45.     Defendant KKMI owns and/or operates the Facility, an approximately 4-acre industrial site located within the City of Richmond.

46.     Industrial activities at the Facility include pressure washing, surface preparation (paint removal, sanding), painting, engine maintenance and repair, hull welding and grinding, hull repair and joinery, bilge cleaning, fuel and lubrication repair and replacement, other activities related to boat building and repair.   transfer and recovery processes; sorting and baling; and vehicle and equipment maintenance.

47.     Pressure washing,

48.     The Facility falls within Standard Industrial Classification ("SIC") Code 3732, "Boat Building and Repairing."

49.     Based on CSPA's investigation, including a review of the Facility's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"), SWPPP, aerial photography, investigation, and CSPA's information and belief, storm water is collected and discharged from the Facility through a series of channels that discharge via at least two outfalls.  The outfalls discharge storm water and pollutants contained in that storm water into Richmond Inner Harbor, which flows into San Francisco Bay.

50.     Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facility where industrial activities occur, and areas where airborne materials associated with the industrial processes at the facility may settle onto the ground.  Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the storm water outfall.

51.     On information and belief, Plaintiff alleges that the majority of storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

52.     On information and belief, Plaintiff alleges that there are insufficient structural storm

water control measures installed at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with exposed areas of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

53.     Since at least August 10, 2013, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility.  The sample results were reported in the Facility's Annual Reports submitted to the Regional Board.  Defendant certified each of those Annual Reports pursuant to the General Permit.

54.     In Annual Reports and storm water sampling results submitted to the Regional Board for the past five years, the Facility has consistently reported high pollutant levels from its storm water sampling results.

55.     The Facility has reported numerous discharges in excess of narrative and numeric water quality standards established in the Basin Plan.  These observations have thus violated narrative and numeric water quality standards established in the Basin Plan and have thus violated Discharge Prohibition A(2) and Receiving Water Limitations C(1) and C(2) of the 1997 Permit; Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A) and VI(B) of the 2015 Permit; and are evidence of ongoing violations of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit.

56.     The levels of zinc in storm water detected by the Facility have exceeded the WQO and CMC for zinc of 0.09 mg/L.  For example, on February 6, 2015, the level of zinc measured from one of the Facility's storm water outfalls was 1.6 mg/L.  That level of zinc is over 17 times the WQO and CMC for zinc.  Defendant also measured levels of zinc in excess of 0.09 mg/L in storm water discharged from the Facility on March 1, 2018, January 8, 2018, January 18, 2017, December

15, 2017, December 8, 2016, March 4, 2016, January 29, 2016, November 9, 2015, November 2, 2015, and October 31, 2014.

57.     The levels of zinc in storm water detected by the Facility have exceeded the benchmark value and annual NAL for zinc of 0.26 mg/L established by EPA and the State Board, respectively.  For example, on February 6, 2015, the level of zinc measured by Defendant from its outfall was 1.6 mg/L.  That level of zinc is over six times the benchmark value and annual NAL for zinc.  Defendant also measured levels of zinc in excess of 0.26 mg/L on March 1, 2018, January 8, 2018, January 18, 2017, December 15, 2016, December 8, 2016, March 4, 2016, January 29, 2016, November 9, 2015, November 2, 2016, and December 31, 2014.

58.     The levels of copper in in storm water detected by the Facility have exceeded the WQO and CMC for copper of 0.0048 mg/L.  For example, on January 18, 2017, the level of copper measured from one of the Facility's storm water outfalls was 5.5 mg/L.  That level of zinc is over 1,145 times the WQO and CMC for copper.  Defendant also measured levels of copper in excess of 0.0048 mg/L in storm water discharged from the Facility on March 1, 2018, January 8, 2018, January 18, 2017, December 15, 2017, December 8, 2016, March 4, 2016, January 29, 2016, November 9, 2015, November 2, 2015, February 6, 2015, and October 31, 2014.

59.     The levels of copper in storm water detected by the Facility have exceeded the benchmark value and annual NAL for copper of 0.0332 mg/L established by EPA and the State Board, respectively.  For example, on January 18, 2017, the level of copper measured by Defendant from its outfall was 5.5 mg/L.  That level of copper is over 165 times the benchmark value and annual NAL for copper.  Defendant also measured levels of copper in excess of 0.0332 mg/L on March 1, 2018, January 8, 2018, December 8, 2016, March 4, 2016, January 29, 2016, November 9, 2015, November 2, 2015, February 6, 2015, and December 31, 2014.

60.     The levels of iron in storm water detected by the Facility have exceeded the benchmark value and annual NAL for iron of 1 mg/L established by EPA and the State Board, respectively.  For example, on January 8, 2018, the level of iron measured by Defendant from one of its outfalls was 10 mg/L.  That level of iron is 10 times the benchmark value and annual NAL for

iron.  Defendant also has measured levels of iron in excess of 1 mg/L on March 1, 2018, January 18, 2017, December 15, 2016, March 6, 2016, January 29, 2016, November 9, 2015, November 2, 2015, and October 31, 2014.

61.     On information and belief, CSPA alleges that during the 2013-2014 wet season, Defendant did not collect either of its required two storm water discharge samples.

62.     On information and belief, CSPA alleges that Defendant failed to collect and analyze a second storm water discharge sample during the second half of the 2016-2017 reporting year.

63.     On information and belief, CSPA alleges that Defendant failed to collect and analyze any storm water discharge sample during the first half of the 2017-2018 reporting year.

64.     On information and belief, CSPA alleges

65.     On information and belief, CSPA alleges that prior to October 31, 2014, Defendant failed to analyze its storm water discharges for BOD.

66.     On information and belief, CSPA alleges that Defendant failed to analyze any of its four storm water discharge samples taken from sample Location A during the 2016-2017 reporting year for O&G.  In addition, on information and belief, CSPA alleges that Defendant failed to analyze its November 2, 2015 storm water discharge sample from sample Location A for O&G.

67.      On information and belief, CSPA alleges Defendant failed to analyze any of its two storm water discharge samples taken from sample Location B during the 2017-2018 reporting year for O&G.  In addition, on information and belief, CSPA alleges that Defendant failed to analyze its March 4, 2016 or November 2, 2015 storm water discharge samples from sample Location B for O&G.

68.     On information and belief, CSPA alleges that Defendant failed to analyze its March 4, 2016 storm water discharge sample from sample Locations A and B for TSS.

69.     On information and belief, CSPA alleges that Defendant has consistently failed to comply with Section B(14) of the 1997 Permit, and Section XV of the 2015 Permit, by failing to complete a proper ACSCE Report as well as an Annual Evaluation for the Facility.

70.     On information and belief, CSPA alleges that since at least August 10, 2013,

Defendant has failed to implement BAT and BCT at the Facility for their discharges of iron, zinc, and copper, and other potentially un-monitored pollutants. Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992. As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

71.     On information and belief, CSPA alleges that since at least August 10, 2013, Defendant has failed to implement an adequate SWPPP for the Facility. CSPA is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set forth site-specific best management practices for the Facility that are consistent with BAT or BCT for the Facility. CSPA is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not comply with the requirements of Section X(H) of the 2015 Permit. The SWPPP also fails to identify and implement advanced BMPs that are not being implemented at the Facility because they do not reflect best industry practice considering BAT/BCT. According to information available to CSPA, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges. CSPA is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by the General Permit.

72.     On information and belief, CSPA alleges that since at least August 10, 2013, Defendant's SWPPP map has failed to comply with Section X.E.3 of the 2015 Permit. The SWPPP map fails to identify where the Facility's industrial activities take place. In addition, the SWPPP map fails to depict the flow direction of each of the Facility's storm water drainage areas, and fails to depict the locations of all storm water conveyance systems, associated discharge locations, and direction of flow at the Facility as required by the General Permit.

73.     Information available to CSPA indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into Richmond Inner Harbor, which flows into San Francisco Bay.

74.     CSPA is informed and believes, and thereupon alleges, that Defendant has failed and

1  continues to fail to alter the Facility's SWPPP, SWPPP map, and site-specific BMPs consistent with

2  the General Permit.

3     75.    Information available to CSPA indicates that Defendant has not fulfilled the

4  requirements set forth in the General Permit for discharges from the Facility due to the continued

5  discharge of contaminated storm water.  CSPA is informed and believes, and thereupon alleges, that

6  all of the violations alleged in this Complaint are ongoing and continuing.

7  **VI.    CLAIMS FOR RELIEF**

8              **FIRST CAUSE OF ACTION**
9              **Failure to Implement the Best Available and**
              **Best Conventional Treatment Technologies**
10     **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

11    76.    CSPA re-alleges and incorporates all of the preceding paragraphs as if fully set forth

12 herein.

13    77.    The General Permit's SWPPP requirements and Effluent Limitation B(3) of the 1997

14 Permit and Effluent Limitation V(A) of the 2015 Permit require dischargers to reduce or prevent

15 pollutants in their storm water discharges through implementation of BAT for toxic and

16 nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement

17 BAT and BCT at the Facility for its discharges of copper, iron, zinc, and other potentially un-

18 monitored pollutants in violation of Effluent Limitation B(3) of the1997 Permit and Effluent

19 Limitation V(A) of the 2015 Permit.

20    78.    Each day since at least August 10, 2013, that Defendant has failed to develop and

21 implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the

22 General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

23    79.    Defendant has been in violation of the BAT/BCT requirements every day since at least

24 August 10, 2013.  Defendant continues to be in violation of the BAT/BCT requirements each day that

25 they fail to develop and fully implement BAT/BCT at the Facility.

26 //

27

28

COMPLAINT

17

### SECOND CAUSE OF ACTION
**Discharges of Contaminated Storm Water
in Violation of Permit Conditions and the Act
(Violations of 33 U.S.C. §§ 1311, 1342)**

80.    CSPA re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

81.    Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

82.    CSPA is informed and believes, and thereupon alleges, that since at least August 10, 2013, Defendant has been discharging polluted storm water from the Facility in excess of applicable water quality standards in violation of Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit.

83.    During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with copper, iron, zinc, and other potentially un-monitored pollutants at levels above applicable water quality standards. The storm water then flows untreated to Richmond Inner Harbor which flows into San Francisco Bay.

84.    CSPA is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

COMPLAINT

85.     CSPA is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

86.     Every day since at least August 10, 2013, that Defendant has discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

### THIRD CAUSE OF ACTION
**Failure to Prepare, Implement, Review, and Update
an Adequate Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

87.     CSPA re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

88.     The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

89.     Defendant has failed to develop and implement an adequate SWPPP for the Facility. Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendant's failure to justify each minimum and advanced BMP not being implemented.

90.     Defendant has failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring.

91.     Each day since August 10, 2013, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

92.     Defendant has been in violation of the SWPPP requirements every day since August 10, 2013.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

COMPLAINT

## FOURTH CAUSE OF ACTION
### Failure to Develop and Implement an
### Adequate Monitoring and Reporting Program
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

93. CSPA re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

94. The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

95. Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility.

96. Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, its failure to sample all required parameters at the Facility.

97. Each day since at least August 10, 2013, that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

## VII.   RELIEF REQUESTED

Wherefore, CSPA respectfully requests that this Court grant the following relief:

a. Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b. Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the 2015 Permit;

c. Enjoin Defendant from further violating the substantive and procedural requirements of the 2015 Permit;

d. Order Defendant immediately to implement storm water pollution control and

COMPLAINT

20

treatment technologies and measures that are equivalent to BAT or BCT;

e.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

f.   Order Defendant to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

g.   Order Defendant to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

h.   Order Defendant to provide CSPA with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

i.   Order Defendant to pay civil penalties of up to $37,500 per day per violation for each violation of the Act since October 28, 2011, up to and including November 2, 2015, and up to $51,570 for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

j.   Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

k.   Award CSPA's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

l.   Award any such other and further relief as this Court may deem appropriate.

Dated: August 10, 2018                    Respectfully submitted,


By:     _/s/ Rebecca L. Davis_____
                    Rebecca L. Davis
                    LOZEAU DRURY LLP
                    Attorneys for California Sportfishing
                    Protection Alliance

COMPLAINT

21